IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| IN RE:<br><br>INVERNESS VILLAGE, an Oklahoma<br>　　not for profit corporation,<br><br>　　　　　　　　　　Debtor. | Case No.: 19-11510-R<br>(Chapter 11) |

## DECLARATION OF MICHAEL THATCHER

I, Michael Thatcher, declare under penalty of perjury pursuant to 28 U.S.C. § 1746:

1. I am the Chief Restructuring Officer ("CRO") of Inverness Village, an Oklahoma not for profit corporation and the debtor and debtor in possession ("Debtor") in the above-captioned case (the "Chapter 11 Case").

2. I am also a Senior Managing Director of GlassRatner Advisory Capital Group, LLC ("GlassRatner"). I was appointed to the role of CRO in December, 2018. I have nearly 20 years of industry and restructuring experience. I have provided restructuring, crisis management, financial advisory, and expert witness consulting services to parties in a broad variety of distressed corporate settings, with significant expertise serving as a chief restructuring officer, Chapter 11 liquidating trustee, receiver in both state and federal courts, and financial advisor to debtors, lenders and unsecured creditor committees. I have extensive distressed healthcare experience, having advised on the restructurings of hospitals, surgical centers, in- and outpatient rehabilitation treatment facilities, providers of hospice and palliative care services, chronic pain diagnostic and treatment services, medical supply distribution businesses, and senior care retirement communities. I am a Certified Insolvency & Restructuring Advisor as designated by the Association of Insolvency & Restructuring Advisors, a member and former BOD member of the Turnaround Management Association – DFW Chapter, member of the American Bankruptcy

Institute, and a member and former BOD member of the Commercial Finance Association, Southwest Chapter.

3. In my capacity as CRO for the Debtor, I have personal knowledge of, and am familiar with, the business affairs, books and records, and financial condition of the Debtor, and I am authorized to submit this Declaration (the "Declaration") on behalf of the Debtor. I submit this Declaration to assist the Court and parties in interest in understanding the circumstances that led to the commencement of this Chapter 11 Case and in support of: (a) the Debtor's voluntary petition for relief under Chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") filed on the date hereof (the "Petition Date") in the United States Bankruptcy Court for the Northern District of Oklahoma (the "Court"); and (b) the various forms of relief that the Debtor has requested or will request from the Court.

4. As CRO, I have undertaken the following duties on behalf of the Debtor prior to the commencement of Debtor's bankruptcy case:

(a) Managed the Debtor's liquidity through the development of 13-week cash flow budgets and tracked actual versus budget performance for the eight-month period prior to filing;

(b) Interacted extensively with the accounting, finance and treasury management teams of Asbury (as hereafter defined), the Debtor's sole member and contract manager;

(c) Interfaced on a regular basis with the Debtor's onsite management team in order to analyze the capital requirements of the retirement campus and managed capital expenditures accordingly;

(d) Worked with the Debtor's Board of Directors and legal counsel on matters related to pre- and post-petition strategy, liquidity, and in negotiations with the Bond Trustee (as hereafter defined) and its financial advisors;

(e) Assisted the Debtor's co-investment banking team in efforts to market the Debtor's

business for sale;

(f) Prepared schedules associated with various drafts of the Debtor's proposed asset purchase agreement; and

(g) Coordinated efforts led by counsel to prepare the Debtor for its Chapter 11 filing, including preparation of the various first-day motions, schedule of assets and liabilities and statement of financial affairs, as well as the matrix utilized to notice creditors and other parties in interest of this Chapter 11 proceeding.

5. Contemporaneously herewith, the Debtor has filed the following motions and applications (collectively, the "First Day Pleadings"):

i. Debtor's Motion for Interim and Final Orders (1) Authorizing Post-Petition Financing; (2) Authorizing Use of Cash Collateral; (3) Providing Adequate Protection; (4) Granting Liens, Security Interests and Super Priority Claims; and (5) Providing Notice to File Objections and Setting of Final Hearing;

ii. Motion of the Debtor for Interim and Final Orders Authorizing the Debtor to Pay Prepetition Salaries, Wages, and Compensation, (II) the Continuation of Employee Benefit Programs and (II) Directing Banks to Honor and Process Checks and Transfers Related to Such Employee Obligations;

iii. Application of the Debtor for Entry of an Order Authorizing the Retention of Epiq Corporate Restructuring, LLC as Official Claims, Noticing and Balloting Agent Combined with Notice and Opportunity for Hearing;

iv. Motion of the Debtor for Entry of an Order Authorizing the Implementation of Procedures to Maintain and Protect Confidential Patient Information;

v. Motion of the Debtor for Entry of Interim and Final Orders (I) Prohibiting Utility Providers from Altering, Refusing or Discontinuing Service, (II) Deeming the Utility Providers Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Requests for Additional Adequate Assurance; and

vi. Motion of Debtor for Order Authorizing the Debtor to Segregate New Resident Entrance Fees and Refund Certain Entrance Fees.

6. I am generally familiar with the contents of each First Day Pleading and believe that the relief sought therein allows the Debtor to fulfill its duties as debtor in possession and

minimize the disruption to the Debtor's business operations that may be caused by this Chapter 11 Case.

7.     Except as otherwise indicated, all facts set forth in this Declaration are based upon my personal knowledge, my review of relevant documents, my opinion based upon my experience and knowledge of the Debtor's operations and financial condition, and information provided to me by management, advisors, or other representatives of the Debtor.  If called as a witness, I would testify consistently with the facts set forth in this Declaration.

## **PRELIMINARY STATEMENT**

8.     Debtor owns the "Inverness Facility", which is a modern senior living community that was completed in 2003 and accommodates residents' needs based on their required level of care through its integrated independent living facility, assisted living facility, and skilled nursing and memory-care facilities.  As a continuing care retirement community (a "CCRC"), Debtor offers its residents a continuum of care in a campus-style setting, providing living accommodations and related health care and support services to a target market of seniors aged 55 and older.  The Inverness Facility is located at 3800 West 71st Street, Tulsa, Creek County, Oklahoma, sits on approximately 190 acres, and includes the following facilities:

   (a)     An independent living facility that has a total of 256 units consisting of (i) 196 Apartments that are one- or two-bedroom units located in a 3-story building with underground parking and covered parking spaces; 40 cottages that range in size from 1,516 to 1,912 square feet, each equipped with a two-car attached garage; and (iii) 20 garden homes that are free-standing residences with floor plans ranging from 2,101 to 2,308 square feet, each equipped with a two-car attached garage and a safe room for severe weather.

   (b)     An assisted living facility that offers personalized care support in a secure area with 31 assisted living units (consisting of 35 beds) and 12 memory care units.

   (c)     A skilled nursing facility that consists of 44 private rooms, all of which are Medicare-certified and 12 of which are in a secure area for memory care residents.

9. Living units include, among other things, designer kitchens with granite countertops, full size appliances, individually controlled heating and air conditioning, and washers and dryers. Debtor also offers its residents a full roster of activities, wellness programs, fine dining, and field trips. Debtor provides its residents with a number of amenities including: (i) a dining room, as well as a private dining room for special occasions, (ii) a bistro/café, (iii) a wellness/fitness center, (iv) a library, (v) a business center, (vi) a beauty salon/barbershop, (vii) a creative arts center and woodworking shop, (viii) various club rooms, (ix residential storage, (x) a mail alcove, (xi) a bank facility and 24 hour ATM. (xii) a chapel, (xiii) a resale shop, (xiv) dog park, and (xv) other amenities. Other amenities include 24-hour security, landscaped courtyards, and an underground parking garage.

10. The Debtor has historically received revenue from several sources, which include: (i) monthly service fees from residents, (ii) per diem rates for skilled nursing services, (iii) fees for optional services, (iv) resident entrance fees, and (v) transportation fees. Entrance Fees range from approximately $250,000 to $600,000. Monthly service fees range from $1,000 to $6,600.

11. Debtor relies on monthly fees paid by residents (the "Monthly Fees") to maintain day-to-day operation of the Inverness Facility. Since January 2018 the Debtor's revenues have been inadequate to honor all its financial obligations. Specifically, in January, 2018 the Debtor failed to have adequate cash flow to service its secured debt. Additionally, since November, 2018 the Debtor has not been refunding entrance fees due to former residents or their families.

12. The operations of the Inverness Facility are managed by Asbury Communities, Inc. ("Asbury") pursuant to a Management Services Agreement. Additionally, upon information and belief, Asbury is the sole member of the Debtor.[1]  Asbury is a Maryland not-for-profit corporation

---

[1] The Debtor is a nonstock corporation that has "members" rather than shareholders.

based in Frederick, Maryland. Asbury serves as the supporting organization of 6 retirement centers located East of the Mississippi River. In various marketing materials, the Debtor is referred to as "Asbury Inverness Village".

13. Debtor has no employees. The staff is employed by Affiliated Associates, Inc.("Affiliated"), an entity affiliated with Asbury. Affiliated employs the staff at the Inverness Facility and is responsible for all employment related matters for such staff.[2] Debtor is responsible for all of the payroll costs and funds the cost of Debtor's staff shortly before disbursement of the payroll and related taxes, fees, and costs by Affiliated.

14. Debtor has a complex financial structure. There are essentially 4 groups of creditors generally described as follows:

(a) Bondholders. UMB Bank, N.A. ("Bond Trustee") serves as trustee for certain unidentified bondholders under that certain Trust Indenture dated as of May 1, 2012 between The Oklahoma Development Finance Authority (the "Issuer") and the Bond Trustee and under that certain Trust Indenture dated as of July 1, 2013 between the Issuer and the Bond Trustee. The Bond Trustee contends that in excess of $65 million is due and owing under the Indentures.

(b) Asbury. In addition to having management and operating responsibility over essentially all aspects of the Inverness Facility, for a period of many years Asbury has provided financial support to the operation of the Inverness Facility in an amount in excess of $45 million. The audit report for the Debtor commissioned by Asbury shows the following amounts of indebtedness owed by the Debtor to Asbury:

| | |
|---|---|
| Due to ACOMM, Net | $11,088,186 |
| Deferred Debt -Due to Asbury Communities, Inc. | $ 6,231,883 |
| Accrued Interest-Deferred Debt | $    347,749 |
| Subordinated Loan-Due to Asbury Communities, Inc. | $13,000,000 |
| Accrued Interest-Subordinated Loan | $ 6,787,946 |

(c) Resident Refund Obligations. Residents at the Inverness Facility execute a Residency Agreement that includes the payment of a significant entrance

---

[2] In addition to the staff employed by Affiliated, 7 or 8 management personnel at the Inverness Facility are employed by Sodexo Operations, LLC and render services at the Inverness Facility related to dining, housekeeping, laundry, and facilities services. The Sodexo employees are provided to the Inverness Facility for a fee pursuant to various service contracts.

fee. Depending on the form of Residency Agreement executed by a resident, a portion of the entrance fee is refundable. The amount of refundable entrance fees is recorded on the Debtor's balance sheet as both a current and non-current liability in an amount in excess of $60 million. Residents or their heirs are only entitled to a refund of the entrance fees upon the satisfaction of several conditions, including a new resident occupying the former's resident's independent living unit.

(d) <u>Trade creditors and Employees</u>. This class of creditors includes trade vendors (including food and drug suppliers) with outstanding and unpaid invoices of Debtor from time to time and staff at the Inverness Facility that are due their compensation from time to time.

15. The Debtor's financial structure is further complicated by the terms and conditions of that certain Subordination Agreement between Asbury, the Bond Trustee, and the Debtor and that Certain Manager's Consent and Agreement between Asbury and the Bond Trustee whereby Asbury subordinated to the Bond Trustee certain indebtedness and payment obligations owed by the Debtor to Asbury.

16. Attached hereto as Exhibit A are the unaudited financial statements for the Debtor for the period ending June 30, 2019, which were prepared by Asbury.

17. Debtor generates monthly operating revenues in a range of $1.5 to $1.7 million.

18. Currently the Inverness Facility has approximately 293 residents with such residents requiring a varying degree of care classified as independent living, assisted living, and skilled nursing.

19. Prior to August, 2018, the Debtor's Board of Directors consisted of dedicated and responsible community and charitable leaders from the Tulsa, Oklahoma area. The members of the Board of Directors served a valuable role in creating and building what became the Inverness Facility. However, because of the financial difficulties encountered by the Debtor in 2018, the Board of Directors was reconstituted so that the members of the Board of Directors would include individuals that had experience dealing with a challenging business and financial environment. Therefore, in August of 2018 the Debtor's Board of Directors was reconstituted with new members

that had significant financial, legal, and operational expertise. The current Board of Directors are all experienced business executives that have the skill set to navigate Inverness Village through its financial difficulties. Each member of the current Board of Directors is paid a monthly fee of $7,500 and reimbursed for reasonable business expenses. Importantly, each of the members of the Board of Directors is independent from, and has no relationship with, Asbury or the stalking horse bidder selected as part of the Sale Process (as defined hereafter).

20. Each member of the Debtor's Board of Directors has been actively involved in the prepetition efforts of the Debtor including the Sale Process. The members of the Board of Directors have directly interfaced with the Bond Trustee and parties interested in acquiring the Inverness Facility, participated in establishing the Sale Process, selected the appropriate professionals for this Chapter 11 Case, monitored the activities of the professionals, and have met regularly (usually on a weekly or more often basis).

21. On October 10, 2018 the Bond Trustee commenced a lawsuit in Creek County, Oklahoma that sought to foreclose on the Inverness Facility (the "Bond Lawsuit"). The Bond Trustee also sought the appointment of a receiver over the Inverness Facility. On October 10, 2018 the District Court for Creek County entered its "Order Appointing Receiver" (the "Order"). The Order was entered on an *ex parte* basis and appointed a Receiver and granted injunctive relief without offering the Debtor an opportunity to challenge the relief requested. The Order also ordered injunctive relief without the posting of a bond as required by Oklahoma law.

22. On October 31, 2018 the Debtor filed "Defendant's Motion to Vacate Ex Parte Order and Brief in Support" that sought to vacate the Order. At a hearing on November 9, 2018 the Court vacated its prior Order appointing a Receiver. A properly noticed hearing on the Application to Appoint Receiver was then scheduled for December 21, 2018.

23. Subsequent to the hearing on November 9, 2018, the Debtor's Board of Directors and the Bond Trustee engaged in a constructive dialogue relating to the future of the Inverness Facility. Those discussions resulted in the execution of a Forbearance Agreement effective December 20, 2018 (the "Forbearance Agreement"). The Forbearance Agreement outlined the retention of a CRO and investment bankers and outlined a timeline for the Sale Process.

A. **Residency Agreements**

23. As is common practice in the CCRC industry, a resident interested in occupying an independent living unit in the Inverness Facility must enter into a Residency Agreement (a "Residency Agreement") with Debtor. Unlike a pure rental retirement community, whereby a resident pays Monthly Fees for services (which fees may increase as the resident's needs change), the Residency Agreement is a life care contract whereby a resident will pay an Entrance Fee and fixed monthly fees (subject to annual increases) for Debtor's commitment to provide services for the duration of the resident's life, regardless of whether (i) the resident's needs change over time, which may require additional services to be provided by Debtor, or (ii) the costs of providing such services increase for Debtor. Significantly, Debtor's commitment to provide life care services continue even if the resident's financial condition deteriorates and is unable to continue to make its payments.

24. The Residency Agreement sets forth terms and conditions under which the resident will occupy a unit, including outlining the obligations for the payment of an Entrance Fee, the amount and timing of the refundable portion of that Entrance Fee, the amount of Monthly Fees to be charged, and other general matters.

25. In general, a prospective resident must pay an Entrance Fee prior to occupying a unit at the Inverness facility. Typically, in order to reserve a unit a prospective resident delivers a fully refundable deposit prior to executing the Residency Agreement and there is oftentimes a period

of time between the placement of a deposit and the execution of the Residency Agreement and payment of the Entrance Fee. The balance of the Entrance Fee is due on or before the move-in date, except in circumstances where a deferred portion of the Entrance Fee is negotiated with the resident.

26. In consideration for payment of Entrance Fees, Monthly Fees and other fees charged by Debtor, residents are furnished with a residence and are given access to a wide array of services.

27. If, after the move-in date set forth in the Residency Agreement, (i) a resident terminates the Residency Agreement; (ii) a resident dies; or (iii) in rare instances, Debtor terminates the Residency Agreement pursuant to the provisions therein, then such resident is entitled to the refundable portion of his or her Entrance Fee (the "Refund") pursuant to the terms of its Residency Agreement. The Refund is due after a resident physically and permanently leaves the unit, including the removal of the resident's personal property, and is made after the date a new Entrance Fee and executed Residency Agreement is received and the new resident has taken occupancy of that resident's unit.

   B.   **Sponsorship by Asbury.**

28. Asbury has been the sole corporate member and sponsor of Debtor since inception. Asbury is a Maryland not-for-profit corporation, a tax-exempt organization under Section 501(c)(3) of the Internal Revenue Code of 1986 (the "Tax Code") and a "supporting organization" under Section 509(a)(3) of the Tax Code.

29. As the sole member of the Debtor, Asbury has certain rights under the Bylaws of the Debtor including the right to remove members of the Board of Directors of the Debtor.

30. In addition to being the sole member of the Debtor, Asbury has historically been the contract manager for the Inverness Facility. Asbury has served in those roles since the inception of the Debtor. Pursuant to a Management Services Agreement, Asbury serves as

exclusive manager of the operations of the Inverness Facility. Asbury provides the following non-exhaustive list of services: (i) determine operating policies and procedures; (ii) develop and execute a sales plan; (iii) establish food and beverage policies; (iv) establish all employment policies, including wage and salary terms, benefits, retirement plans, and bonuses; (v) hire, promote, supervise, direct, train, transfer, and discharge all Debtor's staff; (vi) negotiate and consummate such agreements as Asbury deems necessary or advisable for furnishing all utilities, services, supplies, food, beverages, equipment, and other materials and supplies for the maintenance and operation of the Inverness Facility; (vii) establish advertising and public relations policies; (viii) maintain the financial books and records for the operation of the Inverness Facility; (ix) the payment of all of the expenses of the Debtor; (x) manage legal and compliance matters; (xi) provide and manage information technology including the hosting of the Debtor's computer network; and (xii) strategic planning.

31. As compensation for such services, Asbury charges a management fee equal to approximately 5.4 percent of annual gross operating revenue or $90,983 per month thus far in 2019 and a technology fee equal to $34,993 per month thus far in 2019.

32. Notwithstanding Asbury's management of the Inverness Facility, the Debtor remains the owner and holder of all licenses, accreditation certificates, and contracts obtained in the name of the Debtor in connection with the operation of the Inverness Facility.

33. Since my appointment as CRO, I have attempted to the greatest extent possible to manage the payment of expenses incurred by Asbury on behalf of Debtor. Asbury maintains sole signatory rights associated with the Debtor's primary operating bank account at SunTrust Bank, and to date, has not agreed to the CRO being an additional signor on such account. Shortly after my engagement as CRO in December 2018, Asbury agreed to a protocol wherein they would not make disbursements from the Debtor's operating account without my review and approval. As

part of the protocol, on a weekly basis I am sent a list of disbursements recommended for payment by Asbury.  I analyze the disbursements, compare them with budgeted amounts and available liquidity, re-prioritize as necessary, and instruct Asbury to pay vendors from this authorized disbursement list.  Bi-weekly payroll is approved in similar fashion.

### C. Regulation of the Inverness Facility.

34. Debtor is licensed by the Oklahoma Department of Health as a continuum of care facility pursuant to the Continuum of Care and Assisted Living Act.  63 O.S. § 1-890.1.  A continuum of care facility is defined as an institution that includes licensed nursing facilities and either an assisted living center or a day care center.  As a licensed nursing facility under Oklahoma law, Debtor holds a Certificate of Need pursuant to the Oklahoma Long Term Care Certificate of Need Act.

35. Debtor obtained its Certificate of Need on October 22, 2001 as a qualified retirement facility pursuant to IRS regulations.  Eight days later on November 1, 2001, an amendment to the Oklahoma Long Term Care Certificate of Need Act became effective that provided an exception to the standard Certificate of Need process for not-for-profit life care communities, allowing life care communities to obtain unlimited Certificate of Need nursing beds subject to restrictions after 7 years (the "Life Care Exceptions").  In 2016, the Life Care Exceptions were further amended to mandate the service that must be provided for any prepayment or entry fee and a requirement that the prepayment fee is at least $50,000 and is actuarially established.

36. Debtor asserts that it is not subject to the Life Care Exception and its subsequent amendments because of the basis and timing of its Certificate of Need and that pursuant to the statute the latter amendment only applies to retirement communities commencing obligations after January 1, 2016.

37. As a licensed continuum of care facility, Debtor complies with the regulations and

statutory provisions of the Continuum of Care and Assisted Living Act and the regulations and statutory provisions of the Nursing Home Care Act.  63 O.S. § 1-1900.1 and 63 O.S. § 1-1950 *et seq*.

38.     The offer and acceptance of Debtor's Residency Agreements are subject to the jurisdiction of the Oklahoma Department of Securities (the "<u>ODS</u>").  Pursuant to a letter to Debtor dated November 16, 2001 the ODS has taken the position that the Debtor's form of Residency Agreement is a "security" under Oklahoma law.  As a security, the offer and acceptance of Residency Agreements is subject to the registration and anti-fraud disclosure provisions of Oklahoma securities law.  The Residency Agreements are presently exempt from registration pursuant to an exemption claimed by the Debtor.  While exempt from registration requirements, the Residency Agreements are not exempt from the anti-fraud provisions of Oklahoma law.  Therefore, the form of Residency Agreement offered by the Debtor must contain adequate disclosures of risk relating to the Residency Agreements.

**II.     EVENTS LEADING TO BANKRUPTCY**

39.     At this time, the Inverness Facility has no operational or healthcare issues and has not found itself defending contentious litigation brought on by its residents or its estate.  Since the Debtor's defaults in early 2018 the level of services and care provided to the Debtor's residents have been largely unaffected by the Debtor's financial difficulties.  The reason for the Debtor's bankruptcy case is that Debtor simply cannot continue to maintain its current debt structure.

40.     The senior housing market in Tulsa, Oklahoma is very competitive and has been since Debtor opened for business.  Debtor competes with 3 primary competitors all located within a fifteen (15) mile radius of the Inverness Facility.  Debtors and its competitors compete not only for residents, but also for staff.

41.     From inception, Asbury had financially supported the Debtor by providing direct

cash contributions, waiving certain fees and expenses, and satisfying certain obligations of the Debtor.  Asbury announced to the Debtor late in 2017 that Asbury would no longer financially support the Debtor.  Therefore, the Debtor failed to make its required payments to the Bond Trustee in January, 2018.  Such payment default resulted in a temporary inability to offer Residency Agreements due to the characterization of the Residency Agreements as a "security" under to Oklahoma law.  After initially ceasing the offering of Residency Agreements in January 2018 due to the bond default, the Debtor was able to again offer Residency Agreements from approximately May 15, 2018 through October, 2018.  The Debtor voluntarily suspended the execution of new Residency Agreements in November, 2018 due to a lack of forbearance agreement with the Bond Trustee and the commencement of the Bond Lawsuit.  The Debtor is proposing to the Court a procedure that will allow the Debtor to execute new Residency Agreements during the Chapter 11 Case.

42.     In December 2018, the Debtor's restructuring professionals engaged in discussions with the Bond Trustee that resulted in the execution of the Forbearance Agreement that included a requirement for the submission of periodic operating budgets, and the commencement of a sale process for the Inverness Facility.  Upon the execution of the Forbearance Agreement, the Debtor commenced a process of marketing and offering for sale the Inverness Facility (the "Sale Process").

43.     Since the beginning of 2019, the Debtor has engaged investment bankers and conducted an active and robust sale process for the Inverness Facility.  A total of 634 financial and strategic parties were contacted by the Debtor's professionals and invited to participate in the sale process.  As a result of the initial solicitation, 32 parties executed nondisclosure agreements with the Debtor and were granted access to the Debtor's electronic data room.  After an initial round of due diligence and numerous site visits at the Inverness Facility, 10 parties submitted non-binding

term sheets (the "Initial Proposals") for the acquisition of the Inverness Facility. The Initial Proposals were proposed by for profit and non-profit organizations and included a variety of acquisition structures, including cash purchases and debt restructurings. Parties were then asked to revise their Initial Proposals to further enhance and clarify the consideration being offered. Following a review of the revised Initial Proposals, two parties were determined to have submitted offers that were sufficient to warrant providing additional due diligence and the negotiation of definitive acquisition agreements with the Debtor. Of those two bidders, the Debtor selected Tulsa Hills Community, Inc., an Oklahoma not for profit corporation and subsidiary of Covenant Living Communities and Services, as the Stalking Horse Bidder that submitted the best offer for the Inverness Facility. The Chapter 11 Case was commenced in order to consummate the sale of the Inverness Facility.

### III. FIRST DAY PLEADINGS

44. Contemporaneously with the filing of its Chapter 11 petition, Debtor has filed the First Day Pleadings. The Debtor requests that each of the First Day Pleadings be granted, as they constitute a critical element in ensuring the stabilization of the Debtor's operations at the outset of this Chapter 11 Case.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

Executed this 22nd day of July, 2019.

*/s/ Michael Thatcher*
Chief Restructuring Officer

# EXHIBIT A

Inverness Village
Balance Sheets
As of June 30, 2019 and Year End 2018

|  | 6/30/19 | 12/31/18 |
|---|---:|---:|
| **Assets** | | |
| **Current Assets** | | |
| Cash and Cash Equivalents | $ 920,700 | $ 1,970,579 |
| Restricted Cash | 2,831,515 | 2,222,406 |
| Investments | - | 181 |
| Accounts Receivables, Net | 417,297 | 517,367 |
| Prepaid Expenses and Other Assets | 197,944 | 984,898 |
| Investments Held Under Bond Indenture | 2,773,564 | 3,153,122 |
| Total Current Assets | 7,141,020 | 8,848,553 |
| **Other Assets** | | |
| Property, Plant, & Equipment, Net | 54,664,402 | 56,242,192 |
| Deposits and Other Assets | 5,000 | 5,000 |
| Beneficial Interest in Net Assets of Foundation | 545,135 | 545,135 |
| **Total Assets** | $ 62,355,557 | $ 65,640,880 |
| **Liabilities and Net Assets** | | |
| **Current Liabilities** | | |
| Accounts Payable and Accrued Expenses | $ 554,300 | $ 538,130 |
| Accrued Bond Interest Payable | 3,444,495 | 1,741,151 |
| Deposits From Prospective Residents | 217,280 | 197,280 |
| Entrance Fees Refundable | 1,855,644 | 1,855,644 |
| Deferred Revenue - Other | 355,877 | 698,611 |
| Current Maturities - Long Term Debt | 60,582,973 | 60,549,872 |
| Total Current Liabilities | 67,010,569 | 65,580,688 |
| Long Term Debt | - | - |
| **Other Liabilities** | | |
| Due to ACOMM | 10,935,172 | 11,088,186 |
| Refundable Entrance Fees | 76,656 | 76,656 |
| Deferred Revenue | 7,605,652 | 8,282,555 |
| Estimated Obligation for Future Services | 2,173,271 | 2,173,271 |
| Refundable Entrance Fee Contingent Liability | 60,403,709 | 60,692,165 |
| Accrued Interest - Deferred Debt | 370,926 | 347,749 |
| Deferred Debt - Due to ACOMM | 6,231,883 | 6,231,883 |
| Accrued Interest - Subordinated Loan | 7,110,274 | 6,787,946 |
| Subordinated Loan - Due to ACOMM | 13,000,000 | 13,000,000 |
| **Total Liabilities** | 174,918,112 | 174,261,099 |
| **Net Assets** | | |
| Unrestricted | ( 113,107,690 ) | ( 109,165,354 ) |
| Temporary Restricted | 144,803 | 144,803 |
| Permanently Restricted | 400,332 | 400,332 |
| Total Net Assets | ( 112,562,555 ) | ( 108,620,219 ) |
| **Total Liabilities and Net Assets** | $ 62,355,557 | $ 65,640,880 |

Statement of Operations - Summary
Inverness Village
For the Six Months Ending June 30, 2019

| Account | 2019 Year to Date Actual | Budget | Variance Pos (Neg) | Prior Year |
|---|---:|---:|---:|---:|
| **Revenues, Gains and Other Support** | | | | |
| Net Resident Services | 8,354,171 | 8,856,273 | (502,102) | 8,803,507 |
| Benevolent Care | (2,484) | (35,600) | 33,116 | (82,657) |
| Other Operating Revenue | 188,499 | 130,681 | 57,818 | 133,539 |
| **Net Operating Revenue** | **8,540,186** | **8,951,354** | **(411,168)** | **8,854,389** |
| Amortization of Entrance Fees | 646,019 | 746,240 | (100,221) | 769,887 |
| Interest and Dividend Income | 27,142 | 37,202 | (10,060) | 85,381 |
| Realized Gain/Loss | 0 | (972) | 972 | (27,355) |
| Investment Revenue | 27,142 | 36,230 | (9,088) | 58,026 |
| Foundation Net Contribution Benefit | 156,855 | 105,821 | 51,034 | 160,961 |
| **Total Revenues, Gains and Other Support** | **9,370,202** | **9,839,645** | **(469,443)** | **9,843,263** |
| **Expenses** | | | | |
| Salaries and Wages | 2,867,287 | 3,222,076 | 354,789 | 2,961,820 |
| Employee Benefits | 955,552 | 913,580 | (41,972) | 902,483 |
| Contract Labor | 842,939 | 855,494 | 12,555 | 859,900 |
| Food Purchases | 453,550 | 500,316 | 46,766 | 478,158 |
| Medical Supplies and Other Resident Costs | 330,740 | 412,549 | 81,809 | 383,943 |
| General and Administrative | 1,727,344 | 902,605 | (824,739) | 635,037 |
| Building and Maintenance | 1,055,445 | 1,206,312 | 150,867 | 971,110 |
| Insurance | 173,150 | 81,173 | (91,977) | 80,917 |
| Interest | 2,146,134 | 1,736,679 | (409,455) | 2,173,466 |
| Taxes | 149,142 | 189,971 | 40,829 | 83,266 |
| Bad Debt Allowance | 53,283 | 12,500 | (40,783) | 38,102 |
| Depreciation and Amortizatiion | 1,834,982 | 1,910,515 | 75,533 | 1,922,495 |
| Services Allocation | 777,640 | 778,808 | 1,168 | 897,253 |
| **Total Expenses** | **13,367,188** | **12,722,578** | **(644,610)** | **12,387,950** |
| **Income (Loss) From Operations Before Other Gains/(Losses)** | **(3,996,986)** | **(2,882,933)** | **(1,114,053)** | **(2,544,687)** |
| **Income (Loss) From Operations** | **(3,996,986)** | **(2,882,933)** | **(1,114,053)** | **(2,544,687)** |
| Unrealized Gains/Losses on Investments | | | | (49,983) |
| Foundation Unrealized Gain/Loss | 48,040 | | 48,040 | (7,970) |
| Transfer of Capital - Foundation | 6,611 | | 6,611 | 605,808 |
| **Net Change in Unrestricted Net Assets** | **(3,942,335)** | **(2,882,933)** | **(1,059,402)** | **(1,996,832)** |
| Operating Ratio Expenses | 11,478,923 | 10,799,563 | (679,360) | 10,427,353 |
| Operating Ratio Revenue | 8,567,328 | 8,988,556 | (421,228) | 8,939,770 |
| | 2,911,595 | 1,811,007 | (1,100,588) | 1,487,583 |
| Operating Ratio | 134.0% | 120.1% | -13.9% | 116.6% |

# Statement of Cash Flows
## Inverness Village
### For the Year Ending June 30, 2019

|  | 2019 YTD |
|---|---:|
| **CASH FLOWS FROM OPERATING ACTIVITIES** | |
| (Increase) / Decrease in Net Deficit | (3,942,336) |
| Adjustments to Reconcile (Increase) / Decrease in Net Deficit to Net Cash Provided by Operating Activities: | |
| Provision of Bad Debts | 53,283 |
| Depreciation and Amortization | 1,834,982 |
| Amortization of Discount (Premium) on Bonds | (6,713) |
| Amortization of Deferred Bond Costs | 39,814 |
| Amortization of Entrance Fees | (646,019) |
| Proceeds from Entrance Fees and Advance Deposits | (519,586) |
| Net increase (decrease) in cash due to changes in: | |
| Restricted Cash | (609,109) |
| Accounts Receivable, Net | 46,787 |
| Prepaids and Other Assets | (65,996) |
| Deferred Entrance Fees | 852,949 |
| Deferrred Revenue | (122,488) |
| Accounts Payable and Accrued Expenses | 16,170 |
| Accrued Bond Interest Payable | 1,703,344 |
| Net cash provided by/(used in) operating activities: | (1,364,918) |
| **CASH FLOWS FROM INVESTING ACTIVITIES** | |
| Purchase of Property and Equipment, Net | (257,192) |
| Proceeds from Sale of Investments, Net | 379,739 |
| Net cash provided by/(used in) investing activities: | 122,547 |
| **CASH FLOWS FROM FINANCING ACTIVITIES** | |
| Transfers of Capital to ACOMM | - |
| Increase/(Decrease) in due to/from affiliates | 192,493 |
| Payments on Long-Term Debt | - |
| Net cash provided by/(used in) financing activities: | 192,493 |
| **NET INCREASE / (DECREASE) IN CASH AND CASH EQUIVALENTS** | **(1,049,879)** |
| Cash and Cash Equivalents at Beginning of Period | 1,970,579 |
| **CASH AND CASH EQUIVALENTS - END OF PERIOD** | **920,700** |